## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SPRINGBOARDS TO EDUCATION, INC. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIV. A. NO.: 3:17-cv-00054 |
| SCHOLASTIC BOOK FAIRS, INC., | § | |
| SCHOLASTIC CORPORATION, and | § | |
| HOUGHTON MIFFLIN HARCOURT | § | |
| PUBLISHING CO. | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

Springboards to Education, Inc. ("Springboard", "Springboards" or "Plaintiff") for its

claims against Defendants: Scholastic Book Fairs, Inc. ("SBF"), Scholastic Corporation

("Scholastic"), and Houghton Mifflin Harcourt Publishing Co. ("HMH") (collectively

"Defendants"),[1] files this First Amended Complaint and respectfully alleges as follows:

## NATURE OF ACTION

1.      This is an action at law and in equity for: trademark counterfeiting;

trademark infringement; trademark dilution; and unfair competition arising from

Defendants' unauthorized use of Springboard's federally registered trademark.

Springboard is the exclusive owner of all the trademark rights in and to the Springboards

---

[1]  For the reasons discussed below regarding HMH's acquisition of Read 180 and HMH's undertaking and engaging in the same course of conduct as its co-defendants, the collective term "Defendants" is used throughout this complaint.  Beyond imputing Scholastic and SBF's misconduct onto HMH, HMH is independently liable for its own misconduct after acquiring Read 180.

Trademarks (as referenced and outlined below and shown in Exhibit A, the "Trademarks")

for various goods and services related to the educational field.

2.      Springboard offers for sale reading programs and related educational

products.  The Trademarks are uniquely associated with the Springboard brand and have

come to symbolize the exceptional quality that consumers can expect from Springboard as

the source of such products and services.   Accordingly, Springboard enjoys strong

consumer loyalty, recognition, and goodwill in the educational field and its related

marketplace.

3.      Springboard's claims in the present action arise from Defendants'

unauthorized manufacture, production, distribution, advertisement, promotion, marketing,

offering for sale, and/or sale of educational products and services bearing the Trademarks.

Upon information and belief, Defendants are major infringers of the Trademarks:

Defendants both sell and distribute their counterfeit versions directly to the consuming

public, on a large scale, as to confuse the consumers as the origin of the infringing

products and services.

4.      Defendants are not connected or affiliated with Springboard in any way, nor

do Defendants have permission from Springboard to use any of its Trademarks or any

other intellectual property belonging to Springboard.   Rather, Defendants are blatantly

exploiting the Trademarks for their own commercial gain, intending to confuse and

deceive the public by drawing on Springboard's goodwill in the marketplace.  By offering

for sale and distributing the infringing products and services, Defendants intend to, are

likely to, and do cause confusion and deceive consumers and the public regarding the

source of Defendants' merchandise, all to the detriment of Springboard.

## THE PARTIES

5.      Springboards to Education, Inc. is a corporation organized and existing under

the laws of the State of Texas, having its principal place of business at 3802 South

Highway 281, Edinburg TX 78539.


6.      Scholastic Book Fairs, Inc. is a corporation duly organized and existing under

the laws of the State of Florida and, upon information and belief, maintains a principal

place of business at 1080 Greenwood Boulevard, Lake Mary, FL, 32746.  Scholastic Book

Fairs, Inc. is a subsidiary of Scholastic Corporation.   SBF sells and distributes its

publications in the Northern District of Texas and throughout the United States, including

infringing publications and materials at issue in which Plaintiff's property is/are unlawfully

reproduced. At all times pertinent to the allegations herein, SBF acted through and in

concert with its various imprints, divisions, partners, subsidiaries, predecessors, and affiliates.

7.      Scholastic Corporation is a corporation duly organized and existing under the laws of the State of Delaware and, upon information and belief, maintains a principal place of business at 557 Broadway, New York, New York, 10012.

8.      Houghton Mifflin Harcourt Publishing Co. is a corporation duly organized and existing under the laws of the State of Massachusetts and does business at 2700 La Frontera Boulevard Round Rock, Texas 78681 and, upon information and belief, maintains a principal place of business at 222 Berkeley Street, Boston, Massachusetts, 02116.  HMH sells and distributes its publications in the Northern District of Texas and throughout the United States, including infringing publications and materials at issue in which Plaintiff's property is/are unlawfully reproduced. At all times pertinent to the allegations herein, HMH acted through and in concert with its various imprints, divisions, partners, subsidiaries, predecessors, and affiliates.

## JURISDICTION AND VENUE

9.      Springboards files this action against Defendants for trademark counterfeiting, trademark infringement, and trademark dilution under the Lanham

(Trademark) Act of 1946, 15 U.S.C. §1051 *et seq*. (the "Lanham Act"), and related claims

of unfair competition under the statutory and common law of the State of Texas.   This

Court has subject matter jurisdiction over the trademark claims under 28 U.S.C. §§1331

and 1338(a).

10.     This U.S. District Court has jurisdiction under 28 USC §1331 because Plaintiffs

complain under 18 USC §1961, *et seq*. (civil-RICO); and are related to the same transactions or

occurrences and implicate the same questions of fact and related questions of law.

11.     This Court has diversity jurisdiction because there is complete diversity among

parties and the amount in controversy exceeds $75,000.   See 28 U.S.C. §§ 1332(a), 1441(a).

Complete diversity exists in this case.

12.     This Court has supplemental jurisdiction over the state law claims in this

Complaint which arise under state statutory and common law pursuant to 28 U.S.C. §

1367(a), because the state law claims are so related to the federal claims that they form part

of the same case or controversy and derive from a common nucleus of operative facts.

13.     This Court has personal jurisdiction over Defendants because Defendants transact a sufficient amount of business both within the state of Texas and within this District.

14.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

15.     Springboard designs, markets, and sells reading and related products under the Springboard brand and its associated Trademarks, including but not limited to Motivational products that the purchaser awards to students upon achievement of the requisite thresholds.

16.     Springboard is the owner of the entire right, title and interest in and to various trademark registrations and applications for the Springboard brand for a variety of goods and services, including, but not limited to, the following U.S. trademark registrations (all certificates attached in Exhibit A):   Millionaire Reader® (U.S. Reg. No. 4,080,513); Million Dollar Reader® (U.S. Reg. No. 4,291,796); Millionaire's Reading Club® (U.S. Reg. No. 4,162,765); and Read A Million Words® (U.S. Reg. No. 3,955,345).

"Millionaire Reader," "Million Dollar Reader," "Millionaire's Reading Club," and "Read A Million Words" are suggestive *i.e.*, protectable.

17. The foregoing registrations are valid, subsisting, and in full force and effect.

18. Additionally, Springboard has common law trademark rights in the Springboard unregistered trademarks for use in connection with products and services in the educational field and other related fields.

19. Springboard began offering to sell, marketing and selling products and services bearing the Springboard Trademarks at least as early as 2005.

20. Springboard maintains strict quality control standards for all goods and services under the Springboard brand and Trademarks.

21. Each year Springboard spends substantial resources in marketing and promoting the Springboard brand and Trademarks, and sells hundreds of thousands of dollars of goods and services bearing the Springboard brand and Trademarks.

22. As a result of Springboard's exclusive and extensive use and promotion of the Springboard brand and Trademarks for many years, the marks have acquired enormous value and recognition in the United States and elsewhere throughout the world, all of which

inures to the benefit of Springboard. Consumers, potential customers and other members of the public not only associate the Springboard brand and Trademarks with exceptional materials, style and workmanship approved by Springboard, but also recognize that goods and services bearing the Springboard brand and Trademarks originate exclusively with Springboard. Accordingly, the Springboard brand and Trademarks are symbols of Springboard's quality, reputation, and goodwill and serve as instant source identifiers for Springboard's products.

23.     Defendants have carefully concealed their infringement using a layering approach to embed their infringing "Million Words Club" and "Million Words Reader" within what they call "Read 180" and "Read 180 Universal" (collectively, "Read 180"). Since at least 2006, Scholastic has sold Read 180 to Texas schools. On or about May 29, 2015, Scholastic divested itself of Read 180 by conveying that product/program to HMH. Since May 2015, HMH has sold to Texas schools both Read 180 (rebranded as "Read 180 Universal") HMH's commercial product that contains within it HMH's *infringing* version of Plaintiff's intellectual property. Within Read 180, Defendants market and distribute the infringing property called "Million Words Club" and "Million Words Reader" by, through, or in conjunction with Defendants' Scholastic Bookfairs, Scholastic Counts! and/or Scholastic Read180.

24.     Furthermore, engaging in spoliation, Defendants have wiped and removed from their website (and on-line access) most, if not all evidence of their infringing products.  Prior to the filing of the suit, Defendants' web site contained 'printables' and curriculum using "Million Words Club" and "Million Words Reader," including reading logs, success stories, images of certificates and certificate-earners (students).  Page 80 in the "Scholastic Counts! Educators Guide" at least one examples of infringement, Defendants' use of the very similar and/or confusing Springboards mark/brand, "Million Word Club."  Scholastic Reading Counts! link from the Educator's Guide shows  "Million-Word Readers Club" members holding various counterfeited incentives.  At pages 5 and 25 of "Scholastic Bookfairs Summit Guide" Defendants have downloadable links and curriculum pertaining to the "Million Word Club" tips.  Pages 4 and 5 of Scholastic Bookfairs Independent Reading Resources, distributed at all of Scholastic Bookfairs Summits and available to download off the Scholastic Bookfairs website, contains links (under  "Make The Most of Your…") for individuals to create a "Million-Word Club" and also infringes on Springboards "Top Ten Tips To Instantly Increase Student Success On Your Campus Using The Millionaires Reading Club.

25.     Defendants' website identifies approximately 479 downloads of materials containing the "Million Word Reader" mark and these downloads were available immediate

before the filing of this lawsuit.  Defendants have wiped and removed this evidence from their

website (and on-line access).   One trace of infringement evidence that remains is found at

http://direct.www.scholastic.com/bookfairs/assets/downloads/principal/Tips.rtf  which  provides

that the customer "Create a Million-Word Club" to employ Defendants' infringing product(s).

26.     Defendants deploy their infringing versions by and/or through partnerships with

entities to whom they've marketed and sold their infringing versions.  For example, Defendants

partnered with an entity called Families In Schools from which the partners market, sell or

distribute what they call "Million Word Challenge," an exact clone of Springboards Trademarks

and  trademarked  products  including  Springboards'  Reading  Log.    The  marketing  and

consultation  portion  of  Defendants'  infringing  product(s)  is  also  extremely  similar  to

Springboards marketing and Literacy Celebrations.

27.     Through  usage  the  Trademarks  have  acquired  distinctiveness  in  the  minds  of

ordinary consumers.  At least as early as 2005 Springboards began offering to market and sell

products  and  services  bearing  its  Trademarks.    Ordinary  consumers  immediately  began

associating the Trademarks with Springboards and the quality and character associated with

Springboards.    Springboards  Brand  and  Trademarks  are  correlated  to  years  of  academic

research directly associated with academic success factors.  Springboards' research led to an

innovative way educators would thematically carry their school/school district's vision through a series of incentives, literacy growth tracking records and data assessment.  Springboards' research indicated the importance for educators to have a one stop shop to find everything they needed to create a powerhouse of effective marketing strategies geared to students' grades K-12 that would motivate participation, enhance school culture and climate, and boost test scores. Springboards research tie directly and link to The Critical Success Factors that serve as key focus areas in school improvement planning: Improving Academic Performance, Data Driven Instruction Pinpointing the areas of need and to gear instruction (Increased Leadership Effectiveness, Increased Learning Time, Increase Family and Community Engagement, Improve School Climate, Increase Teacher Quality).    Springboards Key Component is continuous school and school district improvement with the celebration of success.  Since 2006 Springboards has attended and presented in various local, regional, state, and national conferences; including various presentations and at The Texas Elementary Principals and the International Reading Association's Annual Convention.

28.    Defendants offered a variety of products and services that are confusingly similar enough that  would lead consumers to expect that they identify the same source, that similarity is likely to cause confusion, these include literacy celebrations bearing the words "Million

Words Challenge" that incorporate a "Million Words Challenge" reading log, tracking booklet, and Million Word Challenge campaign materials (bookmarks, posters, pamphlets, booklets, etc), all bearing logos and wording almost exactly like Springboards brand.  This is also seen in Scholastic Read 180, Scholastic Reading Counts, Scholastic FACE (Families And Community Engagement) and Scholastic Classroom and Community Group, Scholastic Reading Counts marketing materials, social media posts, school administrator and educator guides, professional development training and workshops, including incentive tips to lure others into Contributory Trademark Infringement, this is evident by searching school districts throughout the United States that use "Million-Word Reader" and/or "Million-Word Club" in conjunction with Scholastic Bookfairs, Scholastic Reading Counts! Or Scholastic Read180.

29.   Both Scholastic and HMH have the same retail outlets and purchasers and are governed by the same purchasing bylaws and procurement responsibilities.  Springboards and Defendants are direct competitors, who market to the same pool of educators, school administrators across the United States.  In fact, the Parties were many times at the same conferences and even co-sponsored a variety of educational events; Scholastic representatives have attended a multitude of literacy events such as TEPSA, IRA, TAIR, FESTIBA where Springboards curriculum, brand and trademarks were presented and displayed.  The Parties

target the same purchasers (whether in "bulk" such as educational institutions or in "units" such as smaller, localized instructors/learners); and the Parties retail outlets are similar: educational industry conferences, school fairs, learning conventions, etc.

30.     The Parties' use ostensibly the same advertising medium.   Through the emergence of social media platforms and online channels, the need for targeted advertising is increasing because companies aim to minimize wasted advertising by means of information technology, educational conferences and sponsorship opportunities around the region, state and nation.   Therefore Springboards and Defendants make almost identical use of on-line media for marketing, and as discussed above, market through conventions, fairs, conferences and other similar education industry convergence events.   Scholastic posted on official Scholastic social media platforms such as Pinterest, Facebook, Twitter, their Curriculum Tips and Printables for "Million Word Club", which has now been wiped clean and deleted.

31.     Defendants are well aware of Springboards' Trademarks.   Scholastic and Springboards have shared the stage by sponsoring and co-sponsoring various literacy events where Springboards brand and trademarks are highly visible and take the main stage, *i.e.* headlining or being marquee-visible.   Scholastic Classroom and Community Group, has co-sponsored The University of Texas Pan-American/now The University of Texas Rio Grande

FIRST AMENDED COMPLAINT                                                    PAGE 13

Valley's FESTIBA (Festival of International Books and Arts).   Springboards is one of the

original founding sponsors of this event and has been received various accolades because of

their impact on literacy in the community and around the United States.

32.     Scholastic has been a direct sponsor of Feria del Libro Families In Schools

Million Word Challenge, which is *not* a licensed or sponsored Springboards event. Scholastic

and HMH have benefited from the popularity of the Trademarks by employing tactics to create

a misconception of being officially associated with Springboards marks and promote their

(Defendants') brand in a covert way.  This association is without permission and without paying

for licensing or sponsorship, and the intent is to delude the customer into believing that there is

an official association to Springboards Brand and Trademarks.  Defendants hitch themselves

upon the repute of the Trademarks, without having to bear sponsorship commitment or pay a

licensing fee.

33.     In light of Defendants' target market being identical to that of Springboards and

as Defendants have been side-by-side participants in the same education industry convergence

events where Springboards presented, marquee, or headlined with its Trademarks, it is evident

that Defendants intended to engage in the unlawful conduct.  From said events, Defendants

observed and became fully aware of the Trademarks and the strength and quality they possess

amongst the Parties' consumers.  From said events, Defendants observed and became fully aware of the Trademarks' component parts and critical features and were thus able to lift, mimic, and reverse engineer to generate and fashion their infringing version.  From said events, Defendants observed and became fully aware of Springboards' ownership of the Trademarks and the proprietary nature of same as to Springboards and Springboards' rights.  From said events, Defendants observed and became fully aware of the revenues Springboards garners from the Trademarks as well as the costs and barriers to entry Defendants faced if they did not engage in infringement.  Defendants' infringement was neither accidental nor unintended.

34.     The shared or overlapping attendance and sponsorship by the Parties at the education industry convergence events gave Defendants insight, if not clear and direct knowledge of the Trademarks.  Despite, or perhaps because of and with, that knowledge, intended to and did intentionally infringe on the Trademarks by generating counterfeits and/or commercially misappropriating the Trademarks without permission.

35.     Consumers purchasing Defendants' products are doing so under the belief that they are buying the Trademarked products from Springboards.  In one instance McAllen ISD parents, stake-holders and consumers of the Trademark products, are confused by that ISD's "Millionaire Reader Fieldtrip to Scholastic Bookfairs Warehouse" because the consumer

associate the Springboards Brand and Trademarks with Defendants (and vice-versa).[2]

Purchasers at education industry convergence events are confused and unable to make the

distinction between the Trademark and Defendants' version also being marketed at the same

event(s).  Further, since Springboards undertook to enforce the protection of its intellectual

property and such was reported by the media, many users of Trademarked products and users of

counterfeit products contacted Springboards to inquire whether or not they were using

properitary products or counterfeit products.

36.     Confusion by the school-level consumer is abound.  A plethora of schools across

the U.S. feature Springboards marks on official Scholastic Bookfairs "schools" feature links to

that particular school's "Million Word Club" implementation of the Millionaires Reading Club.[3]

37.     Defendants have engaged in trademark infringement in violation of 15 U.S.C. §

1114(a); and Defendants have intentionally used an infringing mark with knowledge that the

mark is counterfeit.  After knowing and learning of Springboards' Trademarks (from education

industry convergence events), during the 2010/2011 Academic School Year, Scholastic and its

subsidiaries began implementing the "Million Word Challenge" in a moderated "Scholastic

---

[2] Scholastic Bookfairs collaborated with ISDs for a shopping tour celebrating the Millionaire Readers, all under the guise and confusion that the counterfeits were legitimate in quality and sponsorship by/with Springboards.
[3] Scholastic Bookfairs provided schools across the U.S. with an official Scholastic Bookfairs links to a Scholastic website, where teachers, students, parents and community members logged on to purchase Scholastic Bookfair books.  This is then combined with Trademarked items resulting in the confused belief that Defendants marks and products are the same as the Trademarks.

Educator Community"—in the seven years since then, community educators from across the

U.S. were directed on how to implement Scholastic's infringing products into the third-party

consumer's (or re-seller's) version of the Million Word Challenge.  On or about September 06,

2016, Scholastic partnered with The New Orleans Saints, Carnival Cruise Lines and KIPP

Central City to "kickoff" their "Million Word Readers" assembly (with infringing marks)

copying and mimicking Springboards Millionaire Readers Kickoff event that includes the

Trademarks.

38.     Defendants first became aware of the Trademarks as early as 2005 from their

attendance at various education industry convergence events.  At said events, Springboards

representatives presented to potential customers and others in the industry their Trademark

products and services.  At that time SBF and Scholastic attended the events and learned first-

hand of Springboards Trademark products and services.  Rather than enter a lawful commercial

transaction or agreement with Springboards to purchase or use the Trademarks, SBF and

Scholastic undertook to counterfeit the Trademarks and pass them off as their own.   On

information and belief, at, near, or soon after the events SBF and Scholastic began producing

counterfeits of the Trademark items and including them in their Read 180 program—at a time

they knew such Trademark items belonged to Springboards and yet they intentionally engaged

in and pursed their efforts to produce and sell a product with a sham trademark; they engaged in a calculated reproduction of the genuine trademark, their knock-offs.  SBF and Scholastic's knock-offs were identical with, or substantially indistinguishable from Springboards' registered marks.  HMH also attended the events and after it acquired Read 180, it still attended and participated in the events.

39.    Defendants used Springboards marks in commerce but in failing to maintain the quality and standards Springboards employs, Defendants' use dilutes Springboards' mark.  The similarity in Defendants' and Springboards' marks give rise to an association between the marks leading the public to believe and understand that Defendants' marks are sponsored or approved of by Springboards, when in fact they are not.

40.    The publics' association between Defendants' and Springboards' marks is likely to either impair the distinctiveness of Springboards' mark or harm the reputation of the mark for the reasons (and examples) as discussed above.

41.    The similarity of design between the legitimate and the infringing marks is apparent.  The infringing "Million Words Club" and "Million Words Reader" are strikingly similar to Plaintiff's "Millionaire Reader," "Million Dollar Reader," "Millionaire's Reading Club" and "Read A Million Words" the latter two being the most obviously similar.

42.      By law, there can be no ownership of a trademark in any term that has not been used exclusively by the would-be owner.  That is because the purpose of trademarks is to identify the source of the goods, and if the term is also used by unrelated sources, no trademark exists.  This is true no matter whether the term is inherently distinctive or not.  If the term is used non-exclusively, it cannot be a trademark.  Therefore, if an applicant knows, after reasonable inquiry, that a term has also been used continuously by one or more competitors for a significant time, the applicant cannot honestly swear that the applicant is the owner of the term and that no other person has any rights to the term.  This duty is imposed on the applicant because the government wants to keep junk trademarks out of its registries.  Willful ignorance and unrealistic assessments are not allowed.  Trademark rights arise from exclusive continuous use, not from scattershot trademark applications.

43.      The complained-of unlawful activities are ongoing.  The doctrine of continuing tort or injury applies to the claims here except for the patent-false-marking claims.  Several of the unlawful activities complained of here were first perpetrated in 2007, their discovery, however would be hampered and concealed by the Defendants, who have no incentive or obligation to make public their records and evidence of their knowledge and intrusion into Plaintiff's business and proprietary property, products, and services.  Others of the unlawful

activities were first perpetrated more than 4 years and less than 10 years ago, but are continuations of an ongoing pattern of unlawful activity. Therefore, there is no time bar to this action other than the outer limit for patent false marking.

44.     Plaintiff's standing to bring claims under the federal Lanham Act, and state unfair-competition and trade-practices law is established by the business-competitor, distributor, or business-customer relationships among the parties, by present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity, as set forth in detail herein.

45.     Defendants knowingly engaged in a scheme to intentionally defraud consumers and the public through unauthorized use of the Trademark, effectively claiming the quality, characteristics, and/or content of their counterfeited material are the Trademark products and/or the same as the Trademark products.

46.     Defendants knowingly engaged in a scheme to intentionally defraud Plaintiff out of sales and profits through Defendants' use and sales of inferior knock-off(s).

47.     In intentional furtherance of this scheme, Defendants used the Internet to disseminate Defendants' inferior knock-offs to end-users and consumers across the United

States and in South Texas, and to enable end-users and consumers to purchase the counterfeit

materials online.   The evidence of Defendants' use of the internet is largely if not uniquely

within Defendants' possession, thus Plaintiff is presently unable to proffer specific prima facie

proof other than that gleaned from screen-shots/images of Defendants' web page(s).

48.     In intentional furtherance of this scheme, the Defendants also used the U.S. Mail

and/or other interstate carriers to ship counterfeit materials to purchasing end users or

consumers throughout the United States and South Texas.   The evidence of Defendants' use of

the U.S. Mail and/or other interstate carriers is uniquely within Defendants' possession, thus

Plaintiff is presently unable to proffer prima facie proof.

49.     Defendants' fraudulent activities described herein deceived consumers into

believing their knock-off was a quality protein product like Plaintiff's products, goods, and

services, and caused and enabled consumers to acquire, purchase, use and accept the knock-

off(s) instead of Plaintiff's products, goods, and services.

50.     As a direct and proximate cause of Defendants' schemes and fraudulent activities

set forth herein, Plaintiff sustained injury to its business and property in the form of lost or

diverted sales, competitive advantages, and goodwill in its Trademark.

FIRST AMENDED COMPLAINT                                                      PAGE 21

51.     In 2013 Scholastic and SBF met with McAllen Independent School District's
Assistant Superintendent of Curriculum, Sylvia Ibarra, and Instruction and discussed how
Scholastic and SBF could and would utilize Plaintiff's protected property and how the assistant
superintendent could and would assist Scholastic and SBF in promoting their infringing
version(s) of Plaintiff's product/property.  From 2013 to the present Scholastic and SBF have
been encouraged, aided and abetted schools, school districts and other intermediaries to infringe
on Plaintiff's property by among other things, assisting and guiding in the creating of
counterfeit or knock-off products.

52.     Defendants engaged in trafficking of goods and services bearing counterfeit
marks in violation of the law including but not limited to 18 U.S.C. §2320.

53.     Upon information and belief, Defendants are manufacturing, advertising,
promoting, distributing, offering for sale, and/or selling the products and/or services
bearing marks and/or branding that is confusingly similar to and/or resembling the
Springboards brand and Trademarks ("Counterfeit Products" or "Counterfeits") throughout
at least Texas and most likely the United States.

54.     The breadth of Defendants' counterfeiting is extensive, as Defendants have

sold at least thousands of pieces of Counterfeit Products.   Representative examples of

Defendants' activities include, but are not limited to, the examples in Exhibit B.

55.     Upon information and belief, Defendants continue to offer the Counterfeit

Products for sale.

56.     Defendants are not authorized and never have been authorized by

Springboard to produce, manufacture, distribute, advertise, offer for sale, and/or sell

merchandise bearing the Springboard brand and Trademarks, or any variations thereof.

57.     Upon information and belief, the Defendants' Counterfeit Products are of a

quality substantially inferior to the Springboard brand and Trademarks.

58.     Upon information and belief, Defendants are aware of the extraordinary fame

and strength of the Springboard brand and Trademarks, and the goodwill associated

therewith. Upon information and belief, Defendants had access to the Springboard brand

and Trademarks prior to Defendants' creation and sale of the Counterfeit Products.

59.     Upon information and belief, Defendants are actively using, promoting, and

otherwise advertising, distributing, selling and/or offering for sale substantial quantities of

Counterfeit Products with the knowledge that such goods will be mistaken for genuine Springboard Products.

60.     Upon information and belief, Defendants are conducting their counterfeiting and infringing activities within the United States.

61.     Defendants' use of unauthorized reproductions of Springboard brand and Trademarks in connection with the manufacturing, advertising, promoting, distributing, offering for sale, and/or selling of the Counterfeit Products is likely to cause confusion, deception, and mistake in the minds of consumers, the public, and the trade. Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public and the trade into believing there is a connection or association between genuine Springboard Products and Defendants' Counterfeit Products.

62.     Defendants are engaging in the above-described illegal counterfeiting knowingly and intentionally or at least with reckless disregard or willful blindness to Springboard's rights for the purpose of trading on the goodwill and reputation of Springboard. If Defendants' intentional counterfeiting and infringing activities are not permanently enjoined by this Court, Springboard and the consuming public will continue to be damaged.

FIRST AMENDED COMPLAINT                                                    PAGE 24

63.     HMH is the successor in interest to a certain line of educational products previously produced and sold by Scholastic.   HMH purchased from Scholastic the product/program Scholastic used to infringe and violate Springboards' rights; HMH has continued to engage in and perpetuate the infringement and violation of Springboards' rights.  HMH has been and is engaging in the very same conduct that Scholastic undertook while Scholastic operated its infringing program.   On information and belief, HM purchased the entirety of Scholastic's interest in the infringing program, and made no exceptions for taking on the liabilities arising from acquiring the infringing program.  Since HMH's acquisition, HMH has continued to engage in the conduct made the basis of the claims.

64.     Plaintiff suffered injury to its business or property, and damages, including economic or financial damages, proximately caused by Defendants' unlawful actions, as further set forth with the required specificity under each count.

65.     The damages here are greater than just the sum of damages from each bad action considered in isolation, because purchases are made in consolidated form for convenience and cost savings, and therefore purchasing decisions based on either false assertions of exclusive rights to sell individual products or false assertions of origin, including the Trademarked items

themselves, and exclusive components therein, have a multiplying effect.   As an example, individual schools may purchase any single or packaged item offered by Plaintiff directly from Plaintiff, but it is more convenient and less costly to purchase multiple or bulk offerings (of Plaintiff) in or by a single district.   Also, many schools initially perform research, make their initial decisions from whom to purchase their materials and initial stock, and then stay with that source until motivated to do otherwise.

66.      Defendants' fraudulent scheme complained of here is fraud upon everyone.  It is fraud upon the purchasers and end users of the Trademarked products (the counterfeits Defendants have conjured), because they are falsely told that Defendants own government-sanctioned patents and trademarks or are otherwise authorized distributors.  It is fraud against the providers (the schools and districts) of the Trademarked products, because they are led to believe they are protected in their use and distribution of Counterfeits and are led to believe they can promote the Counterfeits as their own.

67.      Springboard has no adequate remedy at law.

68.      Springboard is suffering irreparable injury and has suffered substantial damages as a result of the Defendants' counterfeiting and infringing activities.

FIRST AMENDED COMPLAINT                                      PAGE 26

69.     The injuries and damages sustained by Springboard have been directly and proximately caused by the Defendants' wrongful reproduction, use, manufacture, design, distribution, advertisement, promotion, offering to sell, and sale of their Counterfeit Products.

## FIRST CLAIM FOR RELIEF

### (Trademark Counterfeiting — 15 U.S.C. § 1114)

70.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

71.     The registrations embodying the Springboard brand and Trademarks are in full force and effect, and the Springboard brand and Trademarks are entitled to protection under both federal law and common law.

72.     Defendant, without authorization from Springboard, has used and is continuing to use spurious designations that are identical to, or substantially indistinguishable from, the Springboard brand and Trademarks in interstate commerce.

73.     The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion and to deceive consumers, the public, and the trade

into believing that Defendants' Counterfeit Products are genuine or authorized products of Springboard.

74.    Upon information and belief, Defendants have acted with knowledge of Springboard's ownership of the Springboard brand and Trademarks and with deliberate intention or reckless disregard to unfairly benefit from the incalculable goodwill inherent in the Springboard brand and Trademarks.

75.    Defendants' acts constitute trademark counterfeiting in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).

76.    Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which they are not in law or equity entitled.

77.    Upon information and belief, Defendants will continue its infringing acts, unless restrained by this Court.

78.    Defendants' acts have damaged and will continue to damage Springboard, and Springboard has no adequate remedy at law.

79.    In light of the foregoing, Springboard is entitled to and demands injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks that are

identical, substantially indistinguishable, and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Springboard has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.0 § 1117(c).

## SECOND CLAIM FOR RELIEF

### (Trademark Infringement — 15 U.S.C. § 1114)

80.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

81.    The Springboard brand and Trademarks are nationally recognized, as being affixed to goods and merchandise of the highest quality and originating with Springboard.

82.    The registration embodying the Springboard brand and Trademarks is in full force and effect, and entitled to protection under both federal law and common law.

83.     Defendants' unauthorized use of the Springboard brand and Trademarks in interstate commerce and advertising of the same constitutes false designation of origin and a false representation that the goods and services are manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Springboard or come from the same source as Springboard and are of the same quality as goods bearing the Springboard brand and Trademarks.

84.     Defendants' use of the Springboard brand and Trademarks is without Springboard's permission or authority and is in total and willful disregard of Springboard's rights to control its trademarks.

85.     Defendants' activities are likely to lead to and result in confusion, mistake or deception and are likely to cause the public to believe that Springboard has produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Springboard.

86.     Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Springboard and reap the benefit of Springboard's goodwill associated with the Springboard brand and Trademarks.

87.     As a direct and proximate result of Defendants' willful and unlawful conduct, Springboard has been damaged and will continue to suffer damage to its business and reputation unless Defendants are restrained by this Court from infringing the Springboard brand and Trademarks.

88.     Defendants' acts have damaged and will continue to damage Springboard, and Springboard has no adequate remedy at law.

89.     In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks or any marks identical and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Springboard has sustained and will continue to sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.0 § 1117(c).

## **THIRD CLAIM FOR RELIEF**

### **(False Designations of Origin False Descriptions — 15 U.S.C. § 1125(a))**

90.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

91.     The Springboard brand and Trademarks are nonfunctional, inherently distinctive, and have achieved a high degree of consumer recognition and serve to identify Springboard as the source of high- quality goods to which the Springboard brand and Trademarks are well known and have gained fame across the country.

92.     Defendants' promotion, advertising, distribution, sale, and/or offering for sale of the Counterfeit Products is likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of said products, and is intended, and is likely, to cause such parties to believe, in error, that the Defendants' Counterfeit Products  have been authorized, sponsored, approved, endorsed or licensed by Springboard, or that Defendants are in some way affiliated with Springboard.

93.     Defendants' use of the Springboard brand and Trademarks is without Springboard's permission or authority and is in total and willful disregard of Springboard's rights to control the Springboard brand and Trademarks.

94.     Defendants' acts have damaged and will continue to damage Springboard and Springboard has no adequate remedy at law.

95.     In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, or any marks confusingly similar thereto, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, as well as the costs of this action.

## FOURTH CLAIM FOR RELIEF

### (Trademark Di1ution — 15 U.S.C. § 1125(e))

96.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

97.     The Springboard brand and Trademarks are strong and distinctive marks and have achieved notoriety and widespread public recognition, and are thus "famous" within the meaning of the Lanham Act.

98.     Defendants have used, in commerce, in connection with the sale of the Counterfeit Products, unauthorized reproductions of the Springboard brand and Trademarks, which are likely to cause, and most likely have caused, confusion or mistake as to the affiliation, connection, or association between Defendants and Springboard, or as to the origin, sponsorship, or approval of said Counterfeit Products by Springboard.

99.     Defendants' acts described above have diluted and continue to dilute the unique and distinctive Springboard brand and Trademarks.  These acts violate the Lanham Act, have injured and, unless immediately restrained, will continue to injure Springboard, causing damage to Springboard in an amount to be determined at trial, as well as irreparable injury to the goodwill and reputation associated with the Springboard brand and Trademarks.

100.    Upon information and belief, Defendants' unlawful actions began after the Springboard brand and Trademarks became famous.

101.    Upon information and belief, Defendants acted knowingly, deliberately and willfully with the intent to trade on the reputation of Springboard, and to dilute the Springboard brand and Trademarks.   Defendants' conduct is willful, wanton, and egregious.

102.    Springboard has no adequate remedy at law to compensate Springboard fully for the damages that have been caused and which will continue to be caused to Springboard by Defendants' unlawful acts unless they are enjoined by this Court.

103.    In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, as well as the costs of this action.

## FIFTH CLAIM FOR RELIEF

(Texas Anti-Dilution Statute – Tex. Bus. & Com. Code § 16.103)

104.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

105.    The Springboard brand and Trademarks are claimed and explained as set forth above.

106.    Due to Springboard's extensive sales of products bearing the Springboard brand and Trademarks, and significant marketing and promotional activities of the

Springboard brand and Trademarks, the Springboard brand and Trademarks have achieved widespread acceptance and recognition among the consuming public and the trade throughout the United States and abroad.

107.    Through Springboard's prominent, long and continuous use in commerce, including commerce within Texas, the Springboard brand and Trademarks have become and continue to be famous and distinctive.

108.    Springboard's arbitrary and distinctive Springboard brand and Trademarks identify Springboard as the source/origin of the goods on which they appear.

109.    After the Springboard brand and Trademarks became famous, Defendant, without authorization from Springboard, began using marks that are confusingly similar to the Springboard brand and Trademarks.  Defendants' use of unauthorized reproductions of the Springboard brand and Trademarks dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to identify and distinguish Springboard's products. Defendants' unlawful use of the Springboard brand and Trademarks in connection with their inferior products also is likely to tarnish the Springboard brand and Trademarks and cause blurring in the minds of consumers between

FIRST AMENDED COMPLAINT                                              PAGE 36

Springboard and Defendant, thereby lessening the value of the Springboard brand and Trademarks as unique identifiers of Springboard's products.

110.    By the acts described above, Defendants have caused and will continue to cause irreparable injury to Springboard's goodwill and business reputation, in violation of the Texas Anti-Dilution Statute, Tex. Bus. & Com. Code § 16.103.

111.    The acts of Defendants alleged in Paragraphs 1-62 above were committed willfully, with full knowledge of Springboards' rights and with the intention of deceiving and misleading the public and causing harm to Springboards.

112.    As a direct and proximate result of Defendants' unlawful acts, Springboards has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

113.    In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, and the costs of this action.

## SIXTH CLAIM FOR RELIEF

### (Common Law Trademark Infringement)

114.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

115.    Springboard owns all rights, title, and interest in and to the Springboard brand and Trademarks, including all common law rights in such marks.

116.    Defendant, without authorization from Springboard, has used and is continuing to use spurious designations that are identical to, substantially indistinguishable from, or confusingly similar to the Springboard brand and Trademarks.

117.    The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion, mistake, and deception among consumers, the public, and the trade as to whether Defendants' Counterfeit Products originate from, or are affiliated with, sponsored by, or endorsed by Springboard.

118.    Defendants' acts constitute trademark infringement in violation of the common law of the State of Texas.

119.     Upon information and belief, Defendants have profited from its unlawful actions and have been unjustly enriched to the detriment of Springboard. Defendants' unlawful actions have caused Springboard damage in an amount presently unknown, but in an amount to be determined at trial.

120.     Springboard has been irreparably harmed and will continue to be irreparably harmed as a result of Defendants' unlawful acts unless Defendants are permanently enjoined from its unlawful conduct.

121.     Springboard has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

122.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

123.     By the acts described above, Defendants have engaged in unfair competition in violation of the common law of the State of Texas.

124.     Defendants' unlawful acts are causing great and irreparable injury to Springboard, and will continue to irreparably harm Springboard unless enjoined.

125.     Upon information and belief, Defendants have profited from their unlawful actions and have been unjustly enriched to the detriment of Springboard. Defendants' unlawful actions have caused Springboard damage in an amount presently unknown, but in an amount to be determined at trial.

## PRAYER FOR RELIEF

126.     WHEREFORE, Springboard respectfully prays that this Court enter judgment in its favor and against Defendants as follows:

127.     Defendants, their agents, servants, employees, officers, associates, attorneys, and all persons acting by, through, or in concert with any of them, are hereby temporarily, preliminarily, and permanently enjoined from using the Springboard brand and Trademarks, including, but not limited to: manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale, or selling any products which bear the Springboard brand and Trademarks or any marks/designs identical, substantially indistinguishable, substantially similar, and/or confusingly similar thereto;

128.     Engaging in any other activity constituting unfair competition with Springboard, or acts and practices that deceive consumers, the public, and/or trade,

including without limitation, the use of designations and design elements associated with Springboard;

129.    Engaging in any other activity that would dilute the distinctiveness of the Springboard brand and Trademarks; and

130.    Committing any other act which falsely represents or which has the effect of falsely representing that the goods and services of Defendants are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Springboard;

131.    Ordering Defendants to recall from any distributors and retailers, and to deliver to Springboard for destruction or other disposition all remaining inventory of Counterfeit Products, or other printed/published material bearing the Springboard brand and Trademarks, or any marks confusingly similar or substantially similar thereto, including all advertisements, promotional and marketing materials therefore, as well as the means of making the same;

132.     Ordering Defendants to file with this Court and serve on Springboard within ten (10) days after entry of the injunction a report in writing, under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

133.     Ordering Defendants to disclose their supplier(s) and manufacturer(s) of the Counterfeit Products and provide all documents, correspondence, receipts, and invoices associated with the purchase of the Counterfeit Products;

134.     Ordering an accounting by Defendants of all gains, profits and advantages derived from their wrongful acts;

135.     Awarding Springboard all of Defendants' profits and all damages sustained by Springboard as a result of Defendants' wrongful acts, and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a) and 17 U.S.C. § 504(b).

136.     Awarding treble damages in the amount of Defendants' profits or Springboard's damages, whichever is greater, for willful infringement pursuant to 15 U.S.C. § 1117(b);

137.    Awarding applicable interest, costs, disbursements and attorneys' fees, pursuant to 15 U.S.C. § 1117(b) and 17 U.S.C. § 505.

138.    Awarding Springboard statutory damages pursuant to 15 U.S.C. §1117(c) and 17 U.S.C. § 504(c);

139.    Awarding Springboard punitive damages in connection with its state law claims; on account of Defendants' willful misconduct and fraud and deceit upon the public; and

140.    Awarding any other injunctive and other equitable relief, under federal civil-RICO and any other remedies authorized by law.

141.    Such other relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Springboard hereby demands a trial by jury of all claims in this litigation.

Dated: July 30, 2017                              Respectfully Submitted,

                                                  **DELEON LAW GROUP PC**

RUBEN C. DeLEON
STATE BAR NO. 00790577
15851 DALLAS PARKWAY
SUITE 600
ADDISON, TEXAS 75001
TELEPHONE:  214-561-8687
FACSIMILE:   877-488-8983

ATTORNEY FOR PLAINTIFF
SPRINGBOARDS TO
EDUCATION, INC.

## CERTIFICATE OF SERVICE

I certify that on July 30, 2017, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

| | |
|---|---|
| JACKSON WALKER LLP | WEIL, GOTSHAL & MANGES LLP |
| SHANNON ZMUD TEICHER | PAUL R. GENENDER |
| STEICHER@JW.COM | PAUL.GENENDER@WEIL.COM |
| FRANKFURT KURNIT KLEIN & SELZ P.C. | *ATTORNEYS FOR DEFENDANT HMH* |
| EDWARD H. ROSENTHAL | |
| EROSENTHAL@FKKS.COM | |
| ANDREW J. UNGBERG | |
| AUNGBERG@FKKS.COM | |
| *ATTORNEYS FOR DEFENDANTS SCHOLASTIC BOOK FAIRS, INC.* | |
| *AND SCHOLASTIC CORPORATION.* | |

  /s/ Manuel Torres
Manuel Torres

# EXHIBIT A

# United States of America
## United States Patent and Trademark Office

## READ A MILLION WORDS

**Reg. No. 3,955,345**
**Registered May 3, 2011**

**Int. Cls.: 16 and 41**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS AND INCENTIVES IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, ANNOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTEBOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES AND PRINTED INCENTIVE MATERIALS TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

FOR: EDUCATION AND ENTERTAINMENT, NAMELY, EDUCATIONAL SERVICES, NAMELY, DEVELOPING AND CONDUCTING TRAINING COURSES, WORKSHOPS, CONFERENCES AND DISTRIBUTION OF TRAINING MATERIALS IN CONNECTION THEREWITH FOR SUBJECT MATTERS AS REQUESTED BY EDUCATIONAL STAKEHOLDERS; ANALYZING EDUCATIONAL TESTS SCORES AND DATA FOR OTHERS; ARRANGING CONTESTS AND INCENTIVE AWARD PROGRAMS TO ENCOURAGE STUDENTS AND ORGANIZATION MEMBERS TO SET UP AND ACHIEVE GOALS IN ACADEMICS, ATTENDANCE, CITIZENSHIP AND CONDUCT; DISTRIBUTION OF TELEVISION PROGRAMS FOR OTHERS, EDUCATION SERVICES, NAMELY, PROVIDING KINDERGARTEN THROUGH 12TH GRADE CLASSROOM INSTRUCTION AND INCENTIVES IN CONNECTION WITH DEVELOPING READING SKILLS AND LANGUAGE COMPREHENSION, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 77-761,990, FILED 6-17-2009.

JAMES GRIFFIN, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office



# United States of America
## United States Patent and Trademark Office

# MILLION DOLLAR READER

**Reg. No. 4,291,796**

**Registered Feb. 19, 2013**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, AN-NOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTE-BOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-1-2005; IN COMMERCE 6-1-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 4,080,513 AND 4,162,765.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "READER", APART FROM THE MARK AS SHOWN.

SER. NO. 85-660,682, FILED 6-25-2012.

DANIEL BRODY, EXAMINING ATTORNEY

Acting Director of the United States Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office

# MILLIONAIRE READER

**Reg. No. 4,080,513**

**Registered Jan. 3, 2012**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS, NAMELY, BOND AND DECORATIVE PAPER; PRINTED MATTER, NAMELY, PRINTED LESSONS AND TEACHING MATERIALS FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FIELD OF INCENTIVES FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, PRINTED CERTIFICATES, PRINTED CHARTS, STICKERS AND IRON ON TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, ANNOUNCE-MENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTEBOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS, PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, AND TEACHING MATERIALS IN THE FIELD OF EDUCATION, REMOVABLE TATTOOS, DECALS, SCHOOL SUPPLY KITS CONTAINING VARIOUS COMBINATIONS OF SELECTED SCHOOL SUP-PLIES, NAMELY, WRITING INSTRUMENTS, PENS, PENCILS, MECHANICAL PENCILS, ERASERS, MARKERS, CRAYONS, HIGHLIGHTER PENS, FOLDERS, NOTEBOOKS, PAPER, PROTRACTORS, PAPER CLIPS, PENCIL SHARPENERS, WRITING GRIPS, GLUE AND BOOKMARKS; SEALS, STUDY GUIDES , IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-1-2005; IN COMMERCE 6-1-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "READER", APART FROM THE MARK AS SHOWN.

SN 77-840,013, FILED 10-2-2009.

CHARLES L. JENKINS, EXAMINING ATTORNEY



*Director of the United States Patent and Trademark Office*



# United States of America

### United States Patent and Trademark Office

## MILLIONAIRE'S READING CLUB

**Reg. No. 4,162,765**

**Registered June 26, 2012**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, AN-NOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTE-BOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 77-839,991, FILED 10-2-2009.

CHARLES L. JENKINS, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office



# United States of America
## United States Patent and Trademark Office

# Feel Like a Million Bucks

**Reg. No. 4,782,995**

**Registered July 28, 2015**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS, NAMELY, BOND AND DECORATIVE PAPER; PRINTED MATTER, NAMELY, PRINTED LESSONS AND TEACHING MATERIALS FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; PRINTED INSTRUCTIONAL, EDUCATIONAL, AND TEACHING MATERIALS IN THE FIELD OF INCENTIVES FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, PRINTED CERTIFICATES, PRINTED CHARTS, STICKERS AND IRON ON TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, ANNOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS FOR USE IN MAKING SIGNS OR POSTERS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTEBOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS, PUBLICA- TIONS, NAMELY, BROCHURES, BOOKLETS, AND TEACHING MATERIALS IN THE FIELD OF EDUCATION, REMOVABLE TATTOOS, DECALS, SCHOOL SUPPLY KITS CONTAINING VARIOUS COMBINATIONS OF SELECTED SCHOOL SUPPLIES, NAMELY, WRITING IN- STRUMENTS, PENS, PENCILS, MECHANICAL PENCILS, ERASERS, MARKERS, CRAYONS, HIGHLIGHTER PENS, FOLDERS, NOTEBOOKS, PAPER, PROTRACTORS, PAPER CLIPS, PENCIL SHARPENERS, WRITING GRIPS, GLUE AND BOOK MARKS; SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-1-2005; IN COMMERCE 6-1-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR- TICULAR FONT, STYLE, SIZE, OR COLOR.

SN 86-258,117, FILED 4-21-2014.

LEIGH CAROLINE CASE, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

# EXHIBIT B

www.educatorcommu   **MORE**

**Houghton Mifflin Harcourt.**

Scholastic's Educational Technology programs are now brought to you by HMH®.

▶ Learn More

PJ |

**READ180**

**UNIVERSAL**   Join Now | Sign In

Search the community   🔍

**MENU ▼**

# Preparing for Your 2013 2014 Year

Posted by Debbie Lee - 3 Years and 4 Months Ago

Whether you teach *READ 180* Stage A, Stage B, or Stag Flex 1 or 2, the tips and blogs of all the *READ 180* blogg will help you prepare for the upcoming school year. C out some great BTS tips from past blog posts of Scott Toonder, Andrea Barnes, Sally Doulton, and me.

Andrea's "Light Your Way to a Successful *READ 180* Yea blog is a great way to greet your students as they enter class this year.

## SCHEDULING

What does your *READ 180* block look like? Is it the full minutes - or something different? In these two blog e Scott Toonder discusses *READ 180* using several sched options: 90 minutes, 75 minutes, and 45 minutes.

· "Thinking About Next Year's Schedule"

· "Making the Model Fit Your Schedule"

## LESSON PLANS FOR THE FIRST THREE WEEKS

Scholastic has provided you with lesson plans that introduce *READ 180* and all its components to your students. You can access this via your Teacher Dashb[oard] in book form with your *READ 180* Teacher Resources, the Resource Library.

· The First Three Weeks

· The First Three Weeks NG

**p92**

· However, if you have returning *READ 180* student[s] want to introduce some different activities during the f[irst] three weeks, check out my previously published blog, "[The] First 3 Weeks the High School Way."

· Andrea Barnes' blog, "Teacher + Student = Success" shows how empowering returning students t[o] teach or review components of READ 180 with the rest [of] the class is a great way to build class rapport.

## ORGANIZATION IS KEY TO A SUCCESSFUL *READ 180* Y[EAR]

Keeping students and teachers organized goes a far w[ay] making everyone's year productive and successful. I us[e] folders and labels to solve many organization woes.

· "New (School) Year Resolution" - Scroll all the wa[y] down to find this time-saving blog.

· "Organization is Key to a Successful *READ 180* Ye[ar]" the Community Resource Library

## READ 180 SOFTWARE TIPS

Check out past blogs by Scott, Andrea and me discussi[ng] the READ 180 software.

· "Reading Zone" by Scott Toonder

· "Word Zone" by Scott Toonder

· "Spelling Zone" by Scott Toonder

· "Success Zone" by Scott Toonder

· "Increase Rigor with the Writing Zone" by Debbie (scroll down)

· "Monitoring Software Progress" by Andrea Barnes

## INDEPENDENT READING IDEAS & TIPS

Independent reading is the most difficult rotation to k[eep] students on task and engaged in reading, but that is to [be] expected. Afterall, if students liked to read, and can fo[...]

Independent reading is the most difficult rotation to k
students on task and engaged in reading, but that is to
expected. Afterall, if students liked to read, and can fo
on their reading, most would not be our students.

· First 3 Weeks Paperback Book Pass

· "Keep Students on Track in Independent Reading
a marking-period-long class book calendar.

· Andrea's "Power Pack Independent Reading"

· Start every day right and "Make Your Students Fe
a Million Dollars When They Walk into Your Classroom
Andrea Barnes

· Something to work toward, Andre s g. a "REA
180 [EOY] Celebration"

· "Organizing your Classroom Library Beyond Crate
Library 101 and 102 by Debbie

## RED ROUTINES

- Refresh your memory of the important Red Routine
  used in READ 180 by checking out the videos in the
  Resource Library. Simply search for "Red Routine."
- Scott's "Red Routine Tips"

## COMMUNITY RESOURCE LIBRARY

Find stretch texts, extra workshop materials, commun
member additions and creations, videos, etc. in the
Resource Library. For tips, check out my blog, "Making
best use of the *READ 180* Community's Educator Libra

## GRADING *READ 180*

· Ask Dee's Grading Tips

· Grading in High School (where grades are often
important and motivational)

## EXIT SLIPS

Exit slips keep students on task to the bell and can be u
as formative assessment, identifying areas students fee
confident in what they learned, and where they are uns
or have questions.

· Sally's Blog, "Exit Slips" gives some great ideas for
exit slips in your READ 180 classroom.

## STUDENT GROWTH OBJECTIVES

Many (most?) educators will be asked to set SGO's for
students this year. Lexiles make setting attainable SGO
easy:

as formative assessment, identifying areas students fee
confident in what they learned, and where they are uns
or have questions.

·     Sally's Blog, "Exit Slips" gives some great ideas for
exit slips in your READ 180 classroom.

### STUDENT GROWTH OBJECTIVES

Many (most?) educators will be asked to set SGO's for
students this year. Lexiles make setting attainable SGC
easy:

·     Check out my blog, "Setting Achievable SRI Goals

·     Check out Andrea's blog "Goal Setting" for a way
make setting and attaining these goals fun.

I hope you all find this blog of links to past blogs by yo
*READ 180* blogging team to be helpful in getting ready
the new school year.



### Share this



---

## Comments ( 1 )

Type your comment here

LOGIN TO COMME

Showing 1 - 1 of 1

#### comments

posted on **Debbie Lee**'s post                          dl

Hi All! I just found another teacher's blog with a rea
cute (fun cute, not young cute) BTS icebreaker acti
where partners make Buddy Books, write a poem, a
introduce their new buddy to the class. You will ne
Google Docs/Google Drive account to view the lin
Here is Judy Holst's Book Buddy Blog:



(http://www.scholastic.com/home/)

About *READ 180*

# THE *READ 180* EXPERIENCE

*READ 180* supports educators with a comprehensive system of curriculum, instruction, and professional development, while providing students with personalized rigorous instruction for college, career, and beyond.

Program Design (reading-program-design.htm)

Model for Blended Learning (3-models-of-blended-learning.htm)

Teacher Facilitated (teacher-facilitated-reading-intervention.htm)

Instructional Technology (literacy-program-instructional-technology.htm)

Independent Reading (independent-online-reading-program.htm)

## Three Stages of Instruction and Support

Respectful and engaging for struggling readers of all ages, *READ 180* provides strategic reading intervention in three stages, each with unique, age-appropriate content for students in Grades 4 –12+.

|  | ELEMENTARY SCHOOL Grades 4–6 | MIDDLE SCHOOL Grades 6–8 | HIGH SCHOOL Grades 7 & Up |
|---|---|---|---|
| **LEVEL 1** Lexile Measures 200L – 400L | 1.5 to 2.5 | 1.5 to 2.5 | 1.5 to 2.5 |

| | | | |
|---|---|---|---|
| **LEVEL 2** Lexile Measures 400L – 700L | 2.5 to 4.0 | 2.5 to 4.0 | 2.5 to 4.0 |
| **LEVEL 3** Lexile Measures 500L – 900L | 4.0 to 6.9 | 4.0 to 6.9 | 4.0 to 6.9 |
| **LEVEL 4** Lexile Measures 800L – 1300L | | 6.0 to 8.9 | 6.0 to 12.0 |

**BEGINNING READERS** Lexile Measures BR – 199L  (../system-44/about-system-44.htm)

ELEMENTARY and SECONDARY
Grades 3–12+

For those students who need foundational reading support, *System 44* (../system-44/about-system-44.htm) is available for your most challenged readers.

---

Product Support (http://edproductsupport.scholastic.com/ts/product/read180nextgeneration)

FAQs (../contact-us/faq.htm)

Site Map (../sitemap.htm)

Customer Service (../contact-us/customer-service.htm)

Sign Up for News and Updates

# 1-877-234-READ

**PRIVACY POLICY (http://www.scholastic.com/privacy.htm)** · Terms of Use (http://www.scholastic.com/terms.htm) · TM ® & © 2016 Scholastic Inc. All Rights Reserved.